# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHEN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| Ruth Ileana Marrero, | : | Case No. 1:12-CV-00125 |
| Plaintiff, | : | |
| v. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

## I. INTRODUCTION

Plaintiff seeks judicial review of the Defendant's final determination denying her claim for an award of Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act (the Act), which appears in Title 42 of the UNITED STATES CODE at Section 1381 *et seq*. Pending are the parties' Briefs on the merits (Docket Nos. 16 & 18). For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI on September 16, 2008, alleging that she became disabled on September 1, 2008 (Docket No. 10, pp. 136-138 of 457). The application was denied initially and upon reconsideration (Docket No. 10, pp. 96-100, 106-112, 113-114, 116-118 of 457). On February 15,

2011, Plaintiff, represented by counsel, and Vocational Expert (VE) James Sorno, appeared and testified at an administrative hearing before Administrative Law Judge (ALJ) C. Howard Prinsloo (Docket No. 10, pp. 20-31 of 457). The ALJ rendered an unfavorable decision on February 25, 2011 (Docket No. 10, pp. 14-16 of 457). The Appeals Council denied Plaintiff's request for review on November 16, 2011 (Docket No. 10, pp. 5-7 of 487). Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

### III.  FACTUAL BACKGROUND.

A video conference hearing was held on February 15, 2011 at Cleveland, Ohio and the National Hearing Center in St. Louis, Missouri. Plaintiff, represented by counsel, a Spanish Interpreter, Olga Rivera and Thomas Nimberger, a Vocational Expert (VE) appeared at an administrative hearing. Plaintiff and the VE testified.

    1.    **PLAINTIFF'S TESTIMONY.**

**A. DEMOGRAPHIC PROFILE**: Plaintiff was 37 years of age. She had four children aged 10, 13, 16 and 18. The oldest child, presumably 18 years of age, assisted her with caring for the younger children (Docket No. 10, pp. 46-47 of 457). Plaintiff had a valid Ohio driver's license (Docket No. 10, p. 50 of 457).

**B**. **IMPAIRMENTS**: Plaintiff had problems with depression and migraine headaches. The symptoms of depression commenced when she migrated to the United States from Puerto Rico two and one half years earlier. Here, Plaintiff (1) was unable to do what she used to do, (2) cried every day, five to six times per day, (3) confined herself to the bedroom where she was laying down most of the time; and (4) left her house once monthly to shop for groceries (Docket No. 10, pp. 45-46, 49, 50, 51 of 457). With migraine headaches, Plaintiff was adversely affected by noise and light (Docket No. 10, p. 49 of 457). Having undergone treatment for joint pain, the pain had been resolved (Docket No. 10, pp. 49-50

2

of 457).

**C. TREATMENT:** Plaintiff saw a counselor weekly. For the past two years, Plaintiff had treated with Dr. Edward Vazquez who saw her biweekly or once monthly depending on the severity of her symptoms. The medication prescribed by Dr. Vasquez "helped just a little." Even with medication, Plaintiff was still depressed, she continued to cry and her ability to concentrate and remember were compromised (Docket No. 10, pp. 48-49 of 457).

**D. EMPLOYMENT HISTORY:** When married, Plaintiff was not permitted to work outside of the home. In 2007, Plaintiff earned $1,329 at a Walmart store in Puerto Rico (Docket No. 10, p. 51 of 547).

**E. WHY PLAINTIFF CANNOT WORK:** Plaintiff claimed that she could not work because her depression was worsening and the medication was no longer effective in controlling her symptoms (Docket No. 10, p. 51-52 of 457).

2.  **THE VE'S TESTIMONY**.

The VE explained that his testimony was consistent with the DICTIONARY OF OCCUPATIONAL TITLES, (DOT), a publication produced by the United States Department of Labor (DOL)[1].

**THE *FIRST* HYPOTHETICAL:** Assuming the following characteristics of the hypothetical plaintiff:

(1)  Age 37 years;
(2)  Same educational background as Plaintiff;
(3)  No past vocational relevant past work:
(3)  Residual functional capacity for work at any exertional level except that the hypothetical plaintiff is limited to simple, routine, competitive tasks.

The VE responded that the hypothetical plaintiff could perform work in three areas:

---

[1] In response to the demand from an expanding public employment service for standardized occupational information to support job placement activities, highly trained occupational analysts collected reliable data which was provided to job interviewers so they could systematically compare and match the specifications of employer job openings with the qualifications of applicants who were seeking jobs through its facilities. In the four editions and two supplements, occupational definitions and attendant changes have been charted to provide the best snapshot of how jobs continue to be performed in the majority of industries across the county. Www.occupationalinfo.org.

3

  (1) Packaging.
  (2) Janitorial.
  (3) Dishwashing.

**THE *SECOND* HYPOTHETICAL**: Presuming the same plaintiff, same age, same employment history, same residual functional capacity except that the hypothetical plaintiff could accommodate no more than occasional changes in the routine work setting. The VE opined that the responses would remain the same (Docket No. 10, p. 53 of 457).

**THE *THIRD* HYPOTHETICAL**: Presuming the same plaintiff, same age, same employment history, same residual functional capacity except that the hypothetical plaintiff could not perform work at a straight production rate pace. The packaging and janitorial jobs would remain within the pool of jobs the hypothetical plaintiff could perform. A third job, sorter, would replace the dishwashing job which the VE suspected could get rather strenuous at meal time (Docket No. 10, pp. 53-54 of 457). The sorter job, found at DOT 209.587-010, was considered sedentary[2] and unskilled[3] work with a specific vocational preparation of 2[4].

 (Docket No. 11, pp. 45-46 of 482).

---

[2] In 20 C.F.R. § 416.910, sedentary work is defined as occasionally lifting no more than ten pounds, and sitting with occasional walking and standing. A sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Although sitting is primarily involved in a sedentary job, walking and standing should be required only occasionally.

[3] Under 20 C. F. R. § 404.1568(a), unskilled work requires little or no judgment to perform simple tasks and can usually be learned in a short period of time. Unskilled work may require strength, but not always.

[4] Specific Vocational Preparation is a component of Worker Characteristics information found in the DOT (U.S. Department of Labor, 1991). SVP is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. The levels of time for a two includes anything beyond short demonstration up to and including 1 month. Www.onetonlne/org/help/nline/svp.

**THE *FOURTH* HYPOTHETICAL**.  Presuming the same hypothetical individual as depicted in the first three hypothetical questions and further assume that this individual has the limitations described in the earlier hypothetical but is unable to engage in sustained work activity for a full eight-hour workday on a regular and consistent basis.  Since the DOT requires "eight hours a day, five days per week, forty hours throughout the year competitively, there would be no work for this hypothetical plaintiff" (Docket No. 10, pp. 54-55 of 457).

**THE *FIFTH* HYPOTHETICAL**.  Posed by counsel, the VE was asked to include a restriction against speaking, comprehending, reading and writing English.  The VE explained that there would be work that this person could perform in the Spanish speaking community without accommodations to get hired or to maintain employment.  Of course, the numbers of jobs would be reduced significantly if you are only permitting someone to exist vocationally in a Spanish speaking environment (Docket No. 10, pp. 55-56 of 457).

### IV.  MEDICAL EVALUATIONS AND TREATMENT

On October 10, 2008, Dr. Mark E. Krofina, M. D., concurred that Plaintiff needed treatment for joint and breast pain, a screening for cervical cancer and depressive disorder.  X-rays of Plaintiff's left hand showed no fracture, dislocation or lesion.  The soft tissue in the left hand was free of laceration, swelling and foreign bodies (Docket No. 10, pp. 263-265 of 457).  Results from the blood and chemical tests showed high titers suggestive of SLE (systematic lupus erythematosus), scleroderma and other connective tissue disease.  The results from the electrocardiogram showed evidence of a regular but unusually slow heart beat (Docket No. 10, pp. 238-245; 248 of 457).

On October 12, 2008, Plaintiff presented to Dr. Zareen Taj with left knee, right breast and chronic left wrist pain.  Dr. Taj suspected that the joint pains were likely rheumatoid arthritis and that

5

the breast pain was likely secondary to caffeine.  Blood tests and a screening for cervical cancer were performed (Docket No. 10, pp. 261-262 of 457).  Dr. Taj subsequently treated Plaintiff's complaints of joint pain with an anti-inflammatory drug.  As an aside, Dr. Taj noted that Plaintiff was crying less and her mood had improved (Docket No. 10, p. 259 of 457).

Dr. Neil F. Sika determined on November 12, 2008 that Plaintiff had hyperopic astigmatism. This ocular condition was easily resolved with corrective lenses (Docket No. 10, p. 256-258 of 457).

On March 6, 2009, Ruth Sudilovsky-Pecha, a licensed social worker employed at the CENTER FOR FAMILIES & CHILDREN, conducted a diagnostic assessment, gathering background information and formulating the initial diagnosis:

| | | |
|---|---|---|
| 1. | Axis 1 | Major depression, recurrent. |
| 2, | Axis 2 | No diagnoses |
| 3. | Axis 3 | Migraines, ? Thyroid. |
| 4. | Axis 4 | Single mother, recent separation from boyfriend, social isolation, no income to pay rent since February, no income and past domestic abuse in past. |
| 5. | Axis 5 | Global Assessment of Functioning score–40 or some impairment in reality testing or communication (ex: speech is sometimes illogical, obscure, irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood (ex: depressed man avoids friends, neglects family, and is unable to work). |

(Docket No. 10, pp. 421-433 of 457; www.gafscore.com).

Ms. Linda Garcia-Cruz, a clinician at the CENTER FOR FAMILIES & CHILDREN, initially identified the causes of depressed and anxious moods in Plaintiff.  For nine months thereafter, she counseled Plaintiff on her feelings, their influence on her daily activities and her family and financial stressors. Then, Ms. Karina Swanson assumed control of the counseling on February 9, 2010 and the goal of the session became to support the pharmacological management and feelings of depression and anxiety.

6

Ms. Swanson appeared to have a calming affect on Plaintiff and through occasional home and office visits, she was successful with resolving some housing, utility, financial and parenting issues. She even assisted Plaintiff with obtaining a valid driver's license. The medical records show that Plaintiff continued counseling with Ms. Swanson after the ALJ rendered the decision denying benefits (Docket No. 10, p. 369-420 of 457).

Less than a year later on March 10, 2009, Dr. Krofina saw and examined Plaintiff for the reason that the medication, namely, Zoloft, was not helping. He addressed issues related to her use of Zoloft for treatment of the depressive disorder and the unspecified hypothyroidism (Docket No. 10, pp. 249-255 of 457).

On March 16, 2009, Dr. Edward Vazquez, M. D., conducted the initial psychiatric evaluation. Using the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS-IV (DSM-IV), Dr. Vazquez made the following assessment:

(1) Axis I:    Major depression, severe, recurrent, without psychotic features
(2) Axis II:   No diagnoses:
(3) Axis III:  Arthritis and rule out thyroid disorder.
(4) Axis IV:   Moving to completely new and different culture.
(5) Axis V:    Global Assessment of Functioning score of 50 that denotes serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

(Docket No. 10, pp. 291-293 of 457; www.gafscore.com).

On March 19, 2009, Dr. Cindy Matyi, Ph. D., competed a PSYCHIATRIC REVIEW TECHNIQUE form and determined that there was insufficient evidence to establish an affective disorder. Similarly, there was insufficient evidence that indicated to what degree the following functional limitations existed:

(1)    Restriction of activities of daily living.
(2)    Difficulties in maintaining social functioning.

7

  (3)  Difficulties in maintaining persistence or pace.
  (4)  Episodes of decompensation, each of extended duration.

(Docket No. 10, pp. 271-281 of 457).

On April 3, 2009, April 8, 2009, May 4, 2009 and June 3, 2009, Dr. Vazquez modified her medications:

  (1)  The Trazodone caused significant stomach problems.
  (2)  Remeron interfered with her ability to sleep and increased her appetite.
  (3)  Clonazepam caused severe chest pain during sleep.
  (4)  Ambien was ineffective.

(Docket No. 10, pp. 286-294 of 457).

On July 29, 2009, August 26, 2009, October 7, 2009 and November 4, 2009, Plaintiff presented to Dr. Vazquez with her home, family and financial stressors. In addition, she complained on occasion that she could not sleep; however, her regimen of drugs was unchanged (Docket No. 10, pp. 343-347 of 457).

Dr. Alice Chambly, Psy. D., competed a MENTAL RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT (MRFC) and a PSYCHIATRIC REVIEW TECHNIQUE form (PRT) on August 24, 2009. Based upon the evidence in the file, it was determined that Plaintiff had no marked limitations. She did, however, have moderate limitations in the ability to:

  (1)  Understand and remember detailed instructions.
  (2)  Carry out detailed instructions.
  (3)  Perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances.
  (4)  Complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.
  (5)  Respond appropriately to changes in the work setting.

(Docket No. 10, pp. 294-296 of 457).

In the PRT, Dr. Chambly opined that from September 16, 2008, Plaintiff had major depression, severe, recurrent without psychotic features. The degree of limitation for each functional limitation as a result of Plaintiff's mental impairments was:

| | | |
|---|---|---|
| (1) | Restriction of activities of daily living | Mild |
| (2) | Difficulties in maintaining social functioning | Mild |
| (3) | Difficulties in maintaining persistence or pace | Moderate. |
| (4) | Episodes of decompensation, each of extended duration | None |

(Docket No. 10, pp. 298-308 of 457).

On September 3, 2009, Plaintiff presented to Dr. Leonor Osorio, D.O. for resolution of uncontrolled anxiety and depression. A sleep study and computed tomography (CT) scan of the brain were recommended and Plaintiff's drug therapy was adjusted (Docket No. 10, pp. 332-335 of 457).

On September 9, 2009, Dr. Eulogio Sioson, M. D., conducted a one time disability evaluation, after which he diagnosed Plaintiff with neck/back/joint pains with no apparent radiculopathy, gross deformity or inflammatory changes in her joints and depression. There were no specific restrictions to work related activities (Docket No. 10, pp. 312-313 of 457). Dr. Sioson determined that Plaintiff could raise her shoulders, her grasp was normal bilaterally, her range of motion in the cervical spine, shoulders, wrists, dorsolumbar spine, hips and knees were lower than normal (Docket No. 10, pp. 314-316 of 457). On October 15, 2009, Dr. Osorio treated Plaintiff for flu-like symptoms including cephalgia (Docket No. 10, pp. 328-330 of 457).

On October 27, 2009, Dr. Rebecca R. Neiger, M. D., determined that Plaintiff had no manipulative, environmental, visual or communicative limitations. Otherwise, Plaintiff's physical

residual functional capacity was limited to the extent that she could:

    (1)    Occasionally lift and/or carry twenty pounds.
    (2)    Frequently lift and/or carry ten pounds.
    (3)    Stand and/or walk for about six hours in an eight-hour workday.
    (4)    Sit about six hours in an eight-hour workday.
    (5)    Push and/or pull on an unlimited basis.
    (6)    Occasionally climb using a ramp or stairs; never climb using a ladder/rope/scaffolds; occasionally stoop, kneel, crouch and crawl.

(Docket No. 10, pp. 319-323 of 457).

Dr. Neiger further determined that Plaintiff's allegations were partially credible and she attributed great weight to Dr. Sioson's conclusions as they were consistent with Plaintiff's allegations and overall evidence (Docket No. 10, p. 324 of 457).

On January 15, 2010, March 12, 2010 and May 17, 2010, Plaintiff reported to Dr. Vazquez that she had some family stressors. On each date her medication regimen was unchanged (Docket No. 10, pp. 338, 340-341 of 457). Then on September 17, 2010, Dr. Vazquez increased the dosage of Zoloft, a medication used to treat depression, although the family's behaviors were relatively tame and Plaintiff was sleeping well. Her appetite had decreased and she had lost some weight (Docket No. 10, pp. 443-444 of 457). On October 11, 2010, Dr. Vazquez altered Plaintiff's medication because of chronic migraines. Dr. Vazquez correlated the onset of such headaches to Plaintiff's daughter's behavior (Docket No. 10, p. 441 of 457). Plaintiff reported on December 1, 2010, to Dr. Vazquez that she had a bad reaction to an antibiotic. The issue was resolved by prescribing another antibiotic (Docket No. 10, p. 439 of 457).

On February 5, 2010, Plaintiff was treated by a nurse practitioner for migraine headaches. The migraine headaches were reduced to one per week by April 22, 2010 (Docket No. 10, pp. 352-355, 356-

360 of 457).

On July 23, 2010, Plaintiff reported making some progress with her medications (Docket No. 10, p. 337 of 457).

On July 23, 2010, August 13, 2010, November 2, 2010, November 16, 2010 and December 17, 2010, Plaintiff presented to Dr. Michael Louis Raddock with, *inter alia*, pain in the abdominal pain, right breast pain, migraine or some variation of a headache, red right eye, middle finger pain, and bladder pain.  An antibiotic, an eye drop and ibuprofen were prescribed to treat the urinary tract infection, irritable eye problems and resolve all of the pain issues.  He related a rash to the consumption of codeine and he assisted Plaintiff with the healing of an abscess on her back with the use of an antiseptic cleaner.  He focused on ways to relieve Plaintiff of migraines and seizures, giving her an injection to treat the migraine headache, prescribing a non-narcotic pain medication and relaxant and an anti-convulsant (Docket No. 10, p. 350-351; 364-366; 449-450; 451-453-457 of 457).

On February 11, 2011, Karina Swanson completed the medical assessment of ability to do work related activities (mental).  In making occupational adjustments, Ms. Swanson suggested that Plaintiff had a poor ability to (1) relate to co-workers or deal with the public, (2) deal with work stresses, (3) function independently, (4) maintain attention and concentration, (5) understand, remember and carry out instructions and (6) understand, remember and carry out detailed but not complex job instructions.  Plaintiff's ability to behave in an emotionally stable manner, related predictably in social situations and demonstrate reliability was also poor (Docket No. 10, pp. 233-234 of 457).

### VI.  STANDARD OF DISABILITY.

The ALJ considered this medical evidence and the testimony adduced by Plaintiff and the VE to decide whether Plaintiff was disabled based on the application for SSI.  SSI is only available only for

11

those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for SSI is found at 20 C.F.R. § 416.920.  To determine disability under Sections 416.920, a plaintiff must first demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a

dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

### VII. ALJ DETERMINATIONS

Based on the five-step sequential evaluation, the ALJ made the following findings of fact:

1. Plaintiff had not engaged in substantial gainful activity since September 16, 2008, the application date.
2. Plaintiff had a severe impairment, depression. However, Plaintiff's impairment or combination of impairments did not meet or medically equal one of the listing impairments in 20 C. F. R Part 404, Subpart P, Appendix 1.
3. Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels except that Plaintiff is limited to performing simple, routine and repetitive tasks with no work requiring the ability to read or write in English and with no more than occasional changes in a routine work setting.
4. Plaintiff had no past relevant work. Considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs that exist in significant numbers in the national economy that Plaintiff could perform.
5. Plaintiff was not under a disability as defined in the Act since June 19, 2008.

(Docket No. 10, pp. 20-31 of 457).

This is the Commissioner's final decision.

### VIII. JUDICIAL REVIEW STANDARD.

This Court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006). The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *Id.* at 833 (*citing Branham v. Gardner,* 383 F.2d 614, 626-627 (6th Cir. 1967)). In fact the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. *Id.* (*citing* 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence

but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services,* 966 F.2d 1028, 1030 (6th Cir. 1992)).

"The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)). Therefore the reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

## IX. ANALYSIS

Plaintiff contends that the opinions of her treating psychiatrist, Dr. Vazquez, and counselor, Ms. Swanson, regarding her psychiatric limitations as related to the performance of work activity are wholly supported by substantial evidence. At the very least, Dr. Vazquez's opinions constitute substantial evidence which should garner a conclusion that Plaintiff is disabled.

Defendant argues that substantial evidence supports the ALJ' determination that the opinions of Dr. Vazquez and Ms. Swanson are entitled to little weight.

It is well established that the treating source rule is one that the ALJ must follow when assessing the medical evidence provided in support of a claim for disability benefits. *Sims v. Astrue*, 2011 WL 1256655, *4 (N. D. Ohio 2011). This rule requires the ALJ to give a treating source opinion "controlling weight" if the treating source opinion is "well-supported by medically acceptable clinical

14

and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (*citing* 20 C.F.R. § 404.1527(d)(2)). A physician qualifies as a treating source if the claimant sees her "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition." *Id.* (*citing* 20 C.F.R. § 404.1502). The ALJ need not credit a treating source opinion that is conclusory and unsupported. *Id.*

Of course the ALJ may grant a treating physician's medical opinions less than controlling weight provided the ALJ's decision is accompanied by "good reasons" that are both: (1) supported by the evidence in the case record, and (2) sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. *Id.* (*citing* SSR. 96–2p, TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE, 1996 WL 374188 (1996)). The ALJ's failure to follow the procedural requirement "of identifying the reasons for discounting the opinion and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (*citing Rogers v. Commissioner of Social Security*, 486 F.3d 234, 243 (6th Cir. 2007)). In the event that the ALJ does not give controlling weight to a treating physician's opinion, he or she must still consider how much, if any, weight to give that opinion by considering the following factors:

(1) the frequency of examination and the length, nature, and extent of the treatment relationship;
(2) the evidence in support of the treating physician's opinion;
(3) the consistency of the opinion with the record as a whole;
(4) whether the opinion is from a specialist; and
(5) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Id.* at *4-5.

In this case, the ALJ applied the treating physician rule and calculated the weight accorded Dr. Vazquez's opinions (Docket No. 10, pp. 27-28 of 457). The ALJ balanced the factors to determine what weight to give Dr. Vazquez's opinions, denied controlling weight and then provided good reasons for giving less weight to those conclusions. Categorizing Dr. Vazquez as a specialist in psychiatry, the ALJ considered this treating source's knowledge about Plaintiff's impairments based on the length, nature and extent of treatment during 2009 and 2010. The treatment notes clearly record Plaintiff's assessment of her moods and problems and Dr. Vazquez's assimilation of her recitations. Dr. Vazquez underscored the importance of obtaining diagnostic or laboratory tests to support his diagnoses and treatments. The ALJ considered this absence of empirical evidence in establishing a comprehensive review of Dr. Vazquez's treatment notes that do not reflect severe obstacles in Plaintiff's functional limitations or ability to work as a result of her mental impairments. To the extent that Dr. Vazquez subsequently overstated his conclusions when he suggested that Plaintiff was disabled, the ALJ relied heavily on the conflicts between his own notes and his conclusions to discount the conclusions accordingly. The Court has a clear understanding why the ALJ credited Dr. Vazquez's opinions as he did. Since the ALJ followed the agency's procedural rules and the good reasons requirements, his opinion as to Dr. Vazquez constitutes substantial evidence.

Similarly, the ALJ identified Ms. Swanson as an "other source," 20 C. F. R. § 416.913(d)(1), who is entitled to consideration due to her expertise and long-term relationship with Plaintiff. The Magistrate acknowledges that under certain circumstances, "other source" opinions are entitled to some weight.

With the growth of managed health care, the Commissioner adopted SSR 06–03p which provides that in addition to evidence from "acceptable medical sources," we may use evidence from "other

16

sources," as defined in 20 C.F.R. § 416.913(d), to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. TITLES II AND XVI: II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS; CONSIDERING DECISIONS ON DISABILITY BY OTHER GOVERNMENTAL AND NONGOVERNMENTAL AGENCIES, 2006 WL 2329939, *2 (August 9, 2006). These sources include, but are not limited to medical sources who are not "acceptable medical sources," such as licensed clinical social workers. *Id*. Information from these "other sources" cannot establish the existence of a medically determinable impairment. *Id.* Instead, there must be evidence from an "acceptable medical source" for this purpose. *Id.* However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function. *Id.*

Here, the ALJ reasoned that Ms. Swanson was an appropriate "other source" who provided a longitudinal view of Plaintiff's life and hardships beginning on February 9, 2010 (Docket No. 10, p. 28 of 457). The ALJ did not give Ms. Swanson's opinions significant weight in establishing the existence of a disability. The ALJ did consider Ms. Swanson's opinions in evaluating the extent and severity of the already determined disability. Limited weight was attributed to Ms. Swanson's opinions and on-going counseling efforts as she tended to manage Plaintiff's life, first evaluating the symptoms and managing her moods and then providing practical resolutions. Consequently, Ms. Swanson's assessment of the severity of Plaintiff's mental impairments on her functional abilities are unsupported by the totality of the evidence in the record.

The ALJ followed the procedural rules. His decision to minimize the weight attributed to Ms. Swanson's opinions is supported by the "other source" rule and the evidence in the record.

### XI. CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Dated: December 27, 2012

### XII. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed. Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, as amended on December 1, 2009, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof. Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure. The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. Any party may respond to another party's objections within fourteen days after being served with a copy thereof.